PER CURIAM:
Plaintiffs-appellants, Norfolk County Retirement System, New England Teamsters & Trucking Industry Pension Fund, Operating Engineers Trust Funds (collectively, “plaintiffs-appellants”), appeal dismissal of their second-amended complaint in this securities-fraud class action, alleging a scheme to defraud Medicare by defendants-appellees, Health Management Associates, Inc. (“HMA”) and its executives, Gary D. Newsome, Kelly E. Curry, and Robert E. Farnham. We affirm.
I. FACTUAL AND PROCEDURAL BACKGROUND
HMA, a for-profit corporation incorporated in Delaware and headquartered in Naples, Florida, operates acute-care hospitals and other healthcare facilities in non-urban areas throughout the United States. The individual defendants-appellees are current or former directors or officers of HMA.[1] Medicare reimburses healthcare providers for medical services provided to individuals covered by the program.
Most hospitals, including those owned by HMA, derive a substantial portion of their revenue from Medicare, which necessitates compliance with its requirements to receive reimbursement. When a patient seeks treatment at a hospital, physicians have three choices regarding that patient’s disposition: (1) admit as an inpatient, (2) admit for observation, or (3) discharge after immediate treatment. Both inpatient status and observation status place patients in a hospital bed, which may involve one or more overnight stays.
Inpatient care generally is reserved for patients requiring high-intensity services, while observational care involves less-intensive services and consists of a hospital stay of eight to forty-eight hours. Medicare reimbursement for inpatient care is substantially greater than for observational care. Medicare will reimburse hospitals for services and treatment that are “reasonable and necessary.” 42 U.S.C. § 1395y(a)(l)(A).
*857 Prior to the start of the class period, July 27, 2009, though January 9, 2012, HMA was a highly leveraged company confronting declining hospital admissions. After resignation of the former HMA Chief Operating Officer (“CEO”), the Board of Directors selected Newsome as President and CEO in September 2008. To improve revenue returns, Newsome told investors HMA would focus on three operational initiatives to improve the company’s financial performance: (1) the Emergency Department, (2) physician recruitment and development, and (8) market-service development. Plaintiffs-appellants allege HMA devised a corporate policy mandating unnecessary admission of Medicare patients to HMA hospitals to boost its financial position and stock price. Consequently, HMA admitted patients for observation, when they did not need to be admitted, and admitted inpatients, who should have been admitted for observation.[2]
Effective at the end of 2009,.HMA upgraded the Pro-MED software used in the Emergency Departments of its hospitals. Pro-MED is a system to control physicians and increase patient admissions by ordering an extensive series of tests, many of which are unnecessary, when a patient enters an emergency room, thereby generating hospital revenue. By allegedly manipulating the Pro-MED system, HMA ensured physicians would enter data to enable the system to recommend the emergency patient be admitted as an inpatient.
HMA allegedly also pressed doctors to admit more Medicare patients, whose costs were guaranteed.[3] It hired outside consultants to review case files and to apply pressure on its physicians to increase admissions, regardless of medical necessity. In addition to admitting improperly patients, who arrived through the Emergency Department, HMA allegedly unnecessarily admitted patients, who arrived at the hospital for scheduled visits, and coded them as inpatients.
In May or June 2011, HMA hired Accre-tive Health, which provides services to help healthcare providers generate sustainable improvements in their operating margins and healthcare quality. HMA had Accretive Health review patient information and pressure physicians to admit observation patients as inpatients. Because the cost per review of a patient file by Accretive Health was approximately $210, HMA determined only files of Medicare patients and possible surgery patients not admitted as inpatients were sent to Accretive Health for review.
HMA ignored reports of improper patient admissions, including reports made by Paul Meyer, a former agent with the Federal Bureau of Investigation and former HMA Director of Compliance, who was tasked with ascertaining whether specific HMA hospitals complied with applicable federal and state laws as well as internal policies. In January 2010, Meyer discovered serious compliance issues involving Medicare billing practices at many HMA hospitals. In the first half *858 of 2010, Meyer warned HMA that several of its hospitals had secured higher government Medicare payments for elderly and disabled patients by fraudulently billing Medicare for patients improperly admitted as inpatients. When Meyer’s compliance concerns were unaddressed and uncorrected by HMA, he advised his supervisor in August 2010 he was going to prepare a detailed memorandum describing his observations for review by HMA top management and Board of Directors. Meyer’s supervisor required him to submit his memorandum to in-house counsel and to moderate it. Meyer was prohibited from listing CEO Newsome as a recipient and instructed by HMA counsel to destroy his drafts of the memorandum, which Meyer did not do.
Meyer submitted his memorandum on August 19, 2010, to his supervisor, Mat Tormey, HMA Vice President of Compliance and Security, who reported directly to the Board of Directors and Newsome. Meyer additionally reported the fraudulent billing practices to Newsome. Rather than addressing the concerns in Meyer’s memorandum, HMA removed Meyer’s oversight at hospitals identified in his memorandum and changed his job responsibilities. Shortly thereafter, HMA terminated his employment. On October 19, 2011, Meyer filed a whistleblower action against HMA. Other HMA employees faced termination for complaining or reporting on fraudulent billing practices.
Plaintiffs-appellants allege the truth about the fraudulent practices for profit of HMA was revealed in various disclosing or revealing events. The first disclosure occurred on August 3, 2011, when HMA revealed it had received two subpoenas from the United States Department of Health and Human Services, Office of Inspector General (“OIG”). The subpoenas sought information related to Emergency Department management and the use of Pro-MED software by HMA. Following disclosure of the subpoenas, HMA stock declined in value and was downgraded by Wall Street analysts; HMA common stock declined by 9.12%. On October 25, 2011, HMA disclosed in its form 10-Q the subpoenas might be related to violations of the Anti-Kickback Statute and False Claims Act and could have resulted from a whis-tleblower complaint, the details of which HMA had withheld.
On November 16, 2011, Richard W. Clayton III, Research Director at CtW Investment Group, sent a letter to Kent P. Dauten, Chairman of the HMA Audit Committee, and informed him HMA admissions rates far exceeded those that could be explained by patient acuity or hospital geography. CtW estimated the excess admissions generated $40 million in excess Medicare billing in 2009, 25% of the net income for that year. Following the revelation of Meyer’s lawsuit, CtW sent a second letter on January 17, 2012, and noted Meyer’s allegations comported with its findings.
On January 9, 2012, equity analyst Sheryl Skolnick of CRT issued a report (“2012 Skolnick Report”) informing the market of the wrongful termination lawsuit filed by Meyer (the “Meyer action”). With this disclosure, the price of HMA common stock declined more than 7% with an abnormal amount of shares traded. The following day, HMA revealed Timothy R. Parry, Senior Vice President, General Counsel, and Secretary had resigned effective immediately. The same day, HMA stock fell an additional 13% with more than sixty-eight million shares traded.
On July 30, 2012, plaintiffs-appellants filed an amended complaint, alleging HMA had violated the Exchange Act during the *859 Class Period.[4] They alleged HMA concealed from investors it had engaged in a scheme to defraud Medicare by improperly admitting and billing patients for unnecessary emergency treatment. HMA moved to dismiss and argued the amended complaint failed to allege sufficiently the requisite falsity, scienter, and loss causation elements of a § 10(b) claim under the Exchange Act, as required by the Private Securities Litigation Reform Act of 1995 (“PSLRA”).
On December 2, 2012, CBS aired a 60 Minutes segment focusing on HMA patient admissions and billing practices. After interviewing over a hundred current and former employees, the program detailed how HMA pressured its physicians to admit patients, who should not have been admitted, to generate higher Medicare revenue, set admissions quotas that could not have been met in the absence of fraud, and customized its Pro-MED computer to justify improper admission of more patients. The segment linked the admissions procedures directly to New-some’s arrival through the testimony of a former HMA Executive Vice President.
The day after this 60 Minutes segment aired, December 3, 2012, the CRT Capital Group LLC published a 161-page report, showing how HMA admission rates changed dramatically after Newsome be- ' came CEO. The report compared HMA hospitals during the 2006-to-2010 period to local competitors in the same state and concluded HMA had a high number of short stays and a low observation rate. The CRT report further determined the HMA troubling admission patterns occurred after its management had changed.
While the HMA motion to dismiss the first-amended complaint was pending, plaintiffs-appellants sought and received leave to file the subject second-amended complaint. Filed on February 25, 2013, the second-amended complaint included facts revealed during the 60 Minutes investigation of HMA patient admissions and billing practices to increase its revenues. HMA again moved to dismiss, based on failure to allege adequately falsity, scien-ter, and loss causation, required by the PSLRA. In his May 21, 2014, opinion and order, the district judge granted the HMA motion to dismiss plaintiffs-appellants’ second-amended, class-action complaint, because plaintiffs-appellants had failed to plead loss causation adequately. Plaintiffs-appellants timely appealed.
II. DISCUSSION
A. Statutory and Pleading Requirements
In this class action, plaintiffs-appellants allege HMA and three of its executives violated § 10(b) of the Exchange Act[5] and Rule 10b-5[6] by failing to disclose the *860 fraudulent scheme of HMA to increase its Medicare revenue. To state a claim for securities fraud under § 10(b) and Rule 10b-5, a plaintiff must allege adequately:
(1) a material misrepresentation or omission; (2) scienter — a wrongful state of mind; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance, “often referred to in cases involving public securities markets (fraud-on-the-market cases) as transaction causation”; (5) economic loss; and (6) “loss causation, i.e., a causal connection between the material misrepresentation and the loss.”
Meyer v. Greene, 710 F.3d 1189, 1194 (11th Cir.2013) (quoting Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S.Ct. 1627, 1631, 161 L.Ed.2d 577 (2005)).
We review a district judge’s dismissal of a complaint de novo and accept all well-pleaded facts as true, construing them most favorably to the nonmoving party. World Holdings, LLC v. Fed. Republic of Germany, 701 F.3d 641, 649 (11th Cir.2012). Nonetheless, “[flactual allegations that are merely consistent with a defendant’s liability fall short of being facially plausible.” Chaparro v. Carnival Corp., 693 F.3d 1333, 1337 (11th Cir.2012) (citations and internal quotation marks omitted). An action alleging securities fraud is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires a complaint “to state with particularity the circumstances constituting fraud.” Fed.R.Civ.P. 9(b); Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1237 (11th Cir.2008). “The particularity requirement of Rule 9(b) is satisfied if the complaint alleges facts as to time, place, and substance of the defendant’s alleged fraud, specifically the details of the defendants’ allegedly fraudulent acts, when they occurred, and who engaged in them.” United States ex rel. Matheny v. Medco Health Solutions, Inc., 671 F.3d 1217, 1222 (11th Cir.2012) (citations and internal quotation marks omitted).
In addition, the PSLRA provides for Rule 10b-5 claims predicated on allegedly false or misleading statements or omissions: “the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.” 15 U.S.C. § 78u-4(b)(1). “[F]or all private Rule 10b-5 actions requiring proof of scienter, ‘the complaint shall, with respect to each act or omission -alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter].’ ” FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1296 (11th Cir.2011) (quoting 15 U.S.C. § 78u-4(b)(2)) (first alteration added). The complaint also must allege facts supporting a strong inference of scienter “for each defendant with respect to each violation.” Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1016 (11th Cir.2004).
The district judge found plaintiffs-appellants had satisfied the PSLRA heightened pleading requirements, bé- *861 cause “the factual allegations, when accepted as true, plausibly state with the requisite particularity the securities fraud claims.” Order Dismissing Second Amended Complaint at 32. He also determined plaintiffs-appellants had “sufficiently plead the false and misleading statements” to show material misrepresentations, id., based on particularized allegations “HMA led the peer group in admissions because of the fraudulent admission of Medicare patients, not the success of the Emergency Department initiatives,” id. at 33.' The judge further concluded, “[bjecause Newsome put the source of HMA’s success at- issue, the alleged failure to disclose the true source of this revenue could give rise to liability under § 10(b),” evidencing plaintiffs-appellants “h[ad] sufficiently alleged that defendants made false and misleading statements.” Id. at 34. Noting “allegations of the aggressive admission policies initiated by Newsome, the individual defendants’ heavy involvement in daily operations, the upgrade of the Pro-MED software, and the use of Accretive Health, the amount and widespread nature of the fraud, the allegations in the Meyer [whistleblower] action, and the investigation by the OIG,” the judge concluded these “allegations, when viewed holistically, create a strong inference of scienter.” Id. at 36. We agree with the district judge’s analysis regarding the second-amended complaint as to particularity, material misrepresentation, and scienter reflected in the purchase and sale of HMA stock.
But the judge reasoned the OIG investigation, without disclosure of actual wrongdoing, did not qualify as a corrective disclosure, in accordance with our Meyer decision. The judge also determined the Meyer whistleblower case and the 2012 Skolnick Report, summarizing the facts of that lawsuit, could not qualify as a corrective disclosure, because the Meyer case did not establish the falsity of any prior statements, and the Skolnick Report was nothing more than a restatement of information that already was public. Therefore, the determinative factor for the district judge and before this court is whether plaintiffs-appellants’ adequately alleged loss causation.[7]
B. Fraud on the Market and Loss Causation
“A ‘fraud on the market’ occurs when a material misrepresentation is knowingly disseminated to an informationally efficient market.” FindWhat, 658 F.3d at 1310 (citing Basic Inc. v. Levinson, 485 U.S. 224, 247, 108 S.Ct. 978, 991-92, 99 L.Ed.2d 194 (1988)). In a § 10(b) lawsuit, a plaintiff must show proof of reliance on the alleged misrepresentation. Erica P. John Fund, Inc. v. Halliburton Co., — U.S. -, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011). Fraud-on-the-market theory relies on the “efficient market hypothesis, which provides ... that ‘in an open and developed securities market, the price of a company’s stock is determined by the available material information regarding the company and its business.’ ” FindWhat, 658 F.3d at 1309-10 (quoting Basic, 485 U.S. at 241, *862 108 S.Ct. at 989). An efficient market transmits information efficiently to prove reliance as well as to prove loss causation. Meyer, 710 F.3d at 1198-99. Fraud-on-the-market theory in class-action, securities-fraud cases creates a rebuttable presumption of reliance, provided the misstatement was material, and the market was informationally efficient. FindWhat, 658 F.3d at 1310 (citing Basic, 485 U.S. at 247, 108 S.Ct. 978, 991-92, 99 L.Ed.2d 194). Plaintiffs-appellants argue the efficient-market hypothesis to establish a presumption of reliance.
Disclosure of information known by the market, confirmatory information, will not cause a change in stock price, because that information already has been assimilated by the market and incorporated in the stock price. Id.
If and when the misinformation is finally corrected by the release of truthful information (often called a “corrective disclosure”), the market will recalibrate the stock price to account for this change in information, eliminating whatever artificial value it had attributed to the price. That is, the inflation within the stock price will “dissipate.”
Id. But merely showing a security was purchased at a price that was artificially inflated by a fraudulent misrepresentation is insufficient. Hubbard v. BankAtlantic Bancorp, Inc., 688 F.3d 713, 725 (11th Cir.2012).
“[I]n a fraud-on-the-market case, the plaintiff must prove not only that a fraudulent misrepresentation artificially inflated the security’s value but also that ‘the fraud-induced inflation that was baked into the plaintiffs purchase price was subsequently removed from the stock’s price, thereby causing losses to the plaintiff.’ ” Id. (quoting FindWhat, 658 F.3d at 1311). Consequently, § 10(b) “is not a prophylaxis against the normal risks attendant to speculation and investment in the financial markets” and only protects against loses attributable to a given misrepresentation. Meyer, 710 F.3d at 1196.
Plaintiffs frequently demonstrate loss causation in fraud-on-the-market cases circumstantially, by: (1) identifying a “corrective disclosure” (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company’s fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure — as opposed to other possible depressive factors — that caused at least a “substantial” amount of the price drop.
FindWhat, 658 F.3d at 1311-12 (footnote omitted).
A corrective disclosure reveals the falsity of a previous representation to the market. Meyer, 710 F.3d at 1197 (citing Lentell v. Merrill Lynch & Co., 396 F.3d 161, 175 n. 4 (2d Cir.2005)); see FindWhat, 658 F.3d at 1311 n. 28. “To be corrective, a disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some negative information about the company.” Id. (citation, internal quotation marks, and alteration omitted). A corrective disclosure can be established by a series of cumulative, partial disclosures. Id.; see Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 261 (5th Cir.2009). Plaintiffs-appellants allege the combination of two partial disclosures — the OIG investigation and the 2012 Skolnick Report— constitutes a corrective disclosure for the purpose of establishing loss causation.
*863 C. Failure to Plead Loss Causation Adequately
“ ‘[L]oss causation analysis in a fraud-on-the-market case focuses on the following question: even if the plaintiffs paid an inflated price for the stock as a result of the fraud, (i.e., even if the plaintiffs relied), did the relevant truth eventually come out and thereby cause the plaintiffs to suffer losses?’ ” Meyer, 710 F.3d at 1197 (quoting FindWhat, 658 F.3d at 1312). The market may react negatively to the disclosure of an investigation, because it “can be seen to portend an added risk of future corrective action.” Id. at 1201. An adverse market reaction, however, does not establish the disclosure of an investigation constitutes a corrective disclosure; further allegations are required to establish that previous statements were “false or fraudulent.” Id. New information is necessary to show loss causation, because “the market price of shares traded on well-developed markets reflects all publicly available information.” Basic Inc., 485 U.S. at 246, 108 S.Ct. at 991.
“[B]eeause a corrective disclosure must reveal a previously concealed truth, it obviously must disclose new information, and cannot be merely confirmatory.” FindWhat, 658 F.3d at 1311 n. 28. We held in Meyer that an SEC investigation, like the OIG investigation in this case, “without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b).” Meyer, 710 F.3d at 1201. Revelation of the OIG investigation, including issuance of subpoenas, does not show any actual wrongdoing and cannot qualify as a corrective disclosure.
Plaintiffs-appellants contend the subsequent 2012 Skolnick Report, combined with the OIG investigation, together provided sufficient evidence of a corrective disclosure to cause an adverse market response and satisfied the requirements of Meyer. The Meyer whistleblower case, the basis of the 2012 Skolnick Report, was not proof of fraud, because a civil suit is not proof of liability. Like the Einhorn Presentation in Meyer, the 2012 Skolnick Report summarized facts from the Meyer case that had existed in publicly accessible court dockets for three months before the Skolnick Report issued. While we may “countenance some lag” in the capacity of the market to digest publicly available information, the Meyer action was publicly available and the impetus for the 2012 Skolnick Report. Id. at 1198 n. 9. Consequently, the information first revealed by the Meyer action and summarized in the 2012 Skolnick Report was easily obtainable, and the market was able to assimilate the information without the assistance of the 2012 Skolnick Report. See Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc., 769 F.3d 313, 323 (5th Cir.2014) (noting “complex economic data understandable only through expert análysis may not be readily digestible by the marketplace” and analysis of that data may not be merely confirmatory); In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1058 (9th Cir.2008) (determining a three-month delay between a disclosure and a price drop did not break the causal chain for loss causation where physicians, but not the general public, would be responsive to the content of a Federal Drug Administration warning letter, and the market did not respond until financial disclosures were made).
“[T]he mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure.” Meyer, 710 F.3d at 1199 (citing cases holding opinions and analyses of publicly available information are not corrective disclosures). The lack of new information in the 2012 Skolnick Report is “fatal to the [plaintiffs-appellants’] claim of loss causation.” Id. at 1198 *864 (citing FindWhat, 658 F.3d at 1311 n. 28). If an analyst’s report, such as the 2012 Skolnick Report, “based on already-public information could form the basis for a corrective disclosure, then every investor who suffers a loss in the financial markets could sue under § 10(b) using an analyst’s negative analysis of public filings as a corrective disclosure.” Id. at 1199.
Plaintiffs-appellants’ allegations show only there was an OIG investigation, a whistleblower lawsuit the market disregarded, and a negative summary of already public information. Taken independently or combined, they are inadequate to establish the falsity of HMA disclosures. Neither the OIG investigation nor the 2012 Skolnick Report are corrective disclosures, establishing a causal link for plaintiffs-appellants’ stock-value loss. After three attempts at drafting complaints, the district judge correctly decided plaintiffs-appellants had failed to allege adequately loss causation to establish their securities-fraud class action and dismissed their case with prejudice.
AFFIRMED.

. Gary Newsome has served as HMA President and Chief Executive Officer since September 15, 2008, and also is a member of the HMA Board of Directors. Kelly Curry has served as HMA Vice President and Chief Financial Officer since January 10, 2010. Robert Farnham was HMA Senior Vice President and Chief Financial Officer from March 2001 through January 10, 2010; he also served as HMA Senior Vice President of Finance.

. Plaintiffs-appellants obtained substantial information to support allegations in the second-amended, class-action complaint by interviewing former HMA employees as confidential witnesses at its various hospitals nationwide.

. Physicians were pressured to admit patients improperly to meet admission quotas set by the HMA corporate office. A confidential witness reported that HMA administrators were concerned, when the admission rate was below 20-22% each day. HMA sent to every HMA hospital daily reports, which contained patient-observation information, including the number of patient observations versus inpatient admissions, patient account numbers, and billing rates.

. Plaintiff-appellant New England Teamsters & Trucking Industry Pension Fund was the court-appointed lead plaintiff.

. Section 10(b) of the Exchange Act provides:
It shall be unlawful for any person, directly or indirectly, ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b).

. Rule 10b-5, promulgated by the SEC pursu- . ant to § 10(b), provides in relevant part:
It shall be unlawful for any person, directly or indirectly, ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading....
17 C.F.R. § 240.10b-5(b).
Plaintiffs-appellants also bring a control-person claim under § 20(a) of the Exchange *860 Act. Section 20(a) liability derives from liability under § 10(b); an examination of their § 20(a) claim necessarily requires a finding of § 10(b) liability. See Thompson v. Relation-Serve Media, Inc., 610 F.3d 628, 635-36 (11th Cir.2010). Since there was no § 10(b) liability, there is no derivative liability on which to base a § 20(a) claim, and we need not address it. See Laperriere v. Vesta Ins. Grp., Inc., 526 F.3d 715, 721 (11th Cir.2008) (per curiam) (noting § 20(a) "unambiguously imposes derivative liability on persons that control primary violators of the Act”).

. Plaintiffs-appellants reference the materialization-of-concealed-risk theory of loss causation. This court "has never decided whether the materialization-of-concealed-risk theory may be used to prove loss causation in a fraud-on-the-market case,” and we do not do so now, because loss causation is sufficient to resolve this case. Hubbard v. BankAtlantic Bancorp, Inc., 688 F.3d 713, 726 n. 25 (11th Cir.2012). In their complaint, plaintiffs-appellants allege HMA created a risk that, absent its fraudulent conduct, revenues and admissions would decline. But plaintiffs-appellants fail to allege adequately how this risk materialized and caused harm to HMA shareholders.